**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

LINDSEY MORGAN CRAMER,   :
                              :
      Plaintiff,           :
                              :
v.                            :      Civil Action No.
                              :      2:10-CV-0159-RWS-SSC
BOJANGLES' RESTAURANTS, Inc., :
                              :
      Defendant.       :

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is before the Court on the motion for summary judgment [Doc. 59] and amended motion for summary judgment [Doc. 81] filed by Defendant Bojangles' Restaurants, Inc. ("Defendant" or "Bojangles' "). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion, as amended, be **GRANTED**.

## I. Procedural History

Plaintiff Lindsey Morgan Cramer ("Plaintiff") is a woman who worked at Bojangles' Dawsonville, Georgia restaurant from about February 3, 2010 to March 22, 2010. (See Doc. 1,Compl. ¶ 8; Doc. 25, Am. Answer ¶ 8; Pl. Dep. at 155). She was 17 years old at the time. (See Pl. Dep. at 5). In her complaint [Doc. 1] in this action, Plaintiff alleges that Defendant subjected her to a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") (Count I). (See id. ¶¶ 94-96). Plaintiff also asserts claims of assault (Count II); battery (Count III); false imprisonment (Count

1

IV); invasion of privacy (Count V); negligent supervision (Count VI); negligent retention (Count VII); constructive discharge (Count VIII); and intentional infliction of emotional distress (Count IX). (See id. ¶¶ 97-185). In addition, she asserts claims for punitive damages (Count X) and expenses of litigation (Count XI). (See id. ¶¶ 186-193). Defendant filed an answer [Doc. 12] and amended answer [Doc. 25] and discovery proceeded.

At the conclusion of the discovery period, Defendant filed a motion for summary judgment with supporting brief, statement of undisputed material facts and exhibits. [Doc. 59]. Plaintiff filed a response to Defendant's motion, a statement of disputed material facts, a response to Defendant's statement of undisputed facts and exhibits. [Doc. 69]. The parties also filed the depositions of Plaintiff and numerous witnesses. [Docs. 61-62, 70-78].

By Order dated May 12, 2011 [Doc. 79], the undersigned directed both parties to file "corrected statements of material fact in which they comply with the provisions of LR 56.1B., [NDGa.]," and amended briefs including references to the corrected statements of fact. (Doc. 79 at 2). The Order specified that "amendments [to the briefs] should be confined to providing references to corrected statements" (Doc. 79 at 2 n.1). Thereafter, Defendant re-filed its motion for summary judgment and exhibits along with an amended supporting brief and an amended statement of material facts. (Doc. 81 & Attachs.). Plaintiff then filed

her brief in response to Defendant's amended brief, with exhibits,[1] an amended statement of disputed material facts[2] and a response to Defendant's corrected statement of undisputed material facts. (Doc. 82 & Attachs.). Defendant filed a response to Plaintiff's statement of additional material facts [Doc. 84] and a reply brief [Doc. 85].[3]

## II. Facts

### A. Standards for Determining Facts for Summary Judgment

The "facts," for summary judgment purposes only, are taken from the submissions of the parties, as set out in Defendant's Corrected Statement of Undisputed Material Facts (hereinafter referred to as "Def. SMF") [Doc. 81-1]; Plaintiff's Response to Defendant's Corrected Statement of Undisputed Facts

---

[1] With her amended response, Plaintiff filed the same exhibits she had filed with her initial response, plus an additional "Declaration of Lindsey Morgan Cramer" dated June 1, 2011. (Doc. 82-15, Ex. M). That declaration was not authorized by the Court's May 12, 2011 Order or otherwise and the undersigned has not considered it in deciding Defendant's motion. See LR 56.1A, NDGa. The undersigned has considered Plaintiff's deposition testimony and the statements made under penalty of perjury in her May 9, 2011 declaration, however. (See Doc. 82-13, Ex. K).

[2] Plaintiff filed two amended statements of material facts: one on May 16, 2011 [Doc. 80] and one on June 2, 2011 [Doc. 82-1]. The most recently filed amended statement of material facts is virtually identical to the original. The undersigned assumes that Plaintiff's most recently filed statement [Doc. 82-1] is the operative document.

[3] Thereafter, Plaintiff filed a surreply to Defendant's reply brief without obtaining leave of Court. [Doc. 86]. This Court has repeatedly stated that the Federal Rules of Civil Procedure and the local rules for the Northern District of Georgia do not provide for the filing of surreplies. See, e.g., Byrom v. Delta Family Care-Disability & Survivorship Plan, 343 F. Supp. 2d 1163, 1188 (N.D. Ga. 2004) ("Neither the Federal Rules of Civil Procedure nor the local rules for the Northern District of Georgia authorize parties to file surreplies. Indeed, 'to allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs.'" (quoting Garrison v. Northeast Ga. Med. Ctr., Inc., 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999 ), aff'd, 211 F.3d 130 (11th Cir. 2000))); see also LR 56.1A, NDGa. ("In accordance with LR 7.1C, the parties shall not be permitted to file supplemental briefs and materials, with the exception of a reply by the movant, except upon order of the court."). The undersigned has not considered Plaintiff's surreply in deciding the motion at issue.

(hereinafter "Pl. Resp. to Def. SMF") [Doc. 82-2]; Plaintiff's Amended Statement of Material Disputed Facts (hereinafter "Pl. SMF") [Doc. 82-1]; Defendant's Response to Plaintiff's Statement of Additional Material Facts (hereinafter "Def. Resp. to Pl. SMF") [Doc. 84]; and uncontroverted record evidence, including the depositions and exhibits submitted by the parties.

The Court has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. However, the Court is not obligated to "scour the record" to make that determination. Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004). The facts are construed in the light most favorable to Plaintiff as the non-movant. See Frederick v. Sprint/United Mgmt.Co., 246 F.3d 1305, 1309 (11th Cir. 2001).

## B. **The Facts Relevant to Defendant's Motions for Summary Judgment**[4]

Defendant operates or franchises about 500 restaurants, including the restaurant located at 25 Main Street, Dawsonville, Georgia (hereinafter "the Dawsonville restaurant"). (Def. SMF ¶¶ 1, 3). Bojangles' Employee Handbook contains an Equal Employment Opportunity Policy and a Harassment/Discrimination Policy. (Def. SMF ¶¶ 6, 10; see also Ex. A to Affidavit of Jeannine M. Eubanks, Doc. 81-3 ("Eubanks Aff.")). The Harassment/Discrimination policy is also contained in a single-page document entitled "Harassment/Discrimination Policy." (Def. SMF ¶ 14; see also Ex. C to Eubanks Aff.). The policy prohibits any

---

[4] Certain other facts relevant to the undersigned's consideration of Defendant's motion are discussed in the body of this Report.

form of discrimination or harassment against its employees based on any prohibited factor, including sex and gender. (Def. SMF ¶ 12; see also Exs. A & C to Eubanks Aff.). The Employee Handbook contains the following information under the heading "Steps to Take If You Are Being Harassed or Observe Harassment":

> If you have any questions about what constitutes harassing behavior, ask your supervisor, another member of management or contact the Human Resources Department. If you feel that another employee is harassing you, you should immediately notify the Area Director. If you do not feel the matter can be discussed with the Area Director, you should contact the Regional Vice President. **You may also contact the Human Resources Department Harassment line at 1-800-849-3360, Ext. 8401**. . . .

> Any employee who experiences harassment by a non-employee, or observes harassment by a non-employment [sic], should report the behavior to his or her supervisor. Appropriate action will be taken with any non-employee for violation of this policy. . . .

> **All suspected harassment should be reported**. Bojangles' cannot attempt to address the questioned behavior if it is not aware of it. All complaints of harassment and/or discrimination, which are reported to an Area Director or to the Human Resources Department, will be investigated as promptly as possible. . . .

(Ex. A to Eubanks Aff. (emphasis in original)). The single-page document entitled "Harassment/Discrimination Policy" contains language that is identical in all material respects. (See Ex. C to Eubanks Aff.). The ServiceCheck hotline is an alternative way for Bojangles' employees to report harassment in the workplace. (Def. SMF ¶ 21). ServiceCheck is a third-party provider that receives complaints or concerns via a toll-free number for Bojangles' employees and customers. (Def. SMF ¶ 22; see also Ex. D to Eubanks Aff.). According to Bojangles' Senior Director

of Human Resources Jeannine M. Eubanks, "Bojangles' has conspicuously posted in each restaurant, including the Dawsonville restaurant, a notice regarding its Employee Awareness Hotline, also commonly referred to as the ServiceCheck hotline." (Eubanks Aff. ¶ 14; <u>see also</u> Ex. D to Eubanks Aff.). Plaintiff testified, however, that she "did not see any posting in the restaurant concerning an Employee Awareness Hotline in March, 2010, and [she] looked for one." (Cramer Decl., Doc. 82-13, Ex. K ¶ 3).

Antonio Aquino serves as Bojangles' Area Director for a geographic area including five company-owned restaurants, including the Dawsonville restaurant. (Def. SMF ¶ 26). Mr. Aquino is responsible for conducting investigations into complaints of harassment and discrimination. (Def. SMF ¶ 27).

Plaintiff began working for Bojangles' as a crew member on February 3, 2010. (Def. SMF ¶ 32). She was responsible for operating a cash register, packing orders, cleaning, making biscuits, running the grill and wrap station, and providing good customer service. (Def. SMF ¶ 33). Plaintiff worked part time, typically two to three days per week from about 4:00 p.m. to 8:00 p.m., although some weekends she worked later than 8:00 p.m. (Def. SMF ¶ 35; Pl. Dep. at 63). She worked a total of 85.2 hours during her entire employment. (Def. SMF ¶ 34; <u>see also</u> Def. Ex. 9 to Pl. Dep.).

On her first day of employment, Plaintiff signed an acknowledgment that she had reviewed a copy of Bojangles' Employee Handbook. (Pl. Dep. at 68-69; <u>see also</u> Ex. B to Eubanks Aff.; Def. Ex. 13 to Pl. Dep.). That same day, Plaintiff also

signed a copy of Bojangles' one-page Harassment/Discrimination Policy below the language at the bottom of the page that read: "By signing below, I acknowledge that I have read and understand the company's policy on harassment and discrimination." (Pl. Dep. at 69; <u>see also</u> Ex. C to Eubanks Aff.; Def. Ex. 14 to Pl. Dep.). Plaintiff did not in fact read the Employee Handbook or the one-page Harassment/Discrimination Policy at that time, nor did she receive a copy of either document at that time. (Pl. Dep. at 69-71).

Defendant employed Olbin Fernando Funez ("Mr. Funez") as a crew member between February 26, 2009 and April 4, 2010. (Def. SMF ¶ 37). Mr. Funez and Plaintiff were co-workers, and they had similar job duties. (Def. SMF ¶ 38; Pl. Resp. to Def. SMF ¶ 38). Based on Bojangles' work schedules and time records for Plaintiff and Mr. Funez, it appears that they worked on the same scheduled shift just three times during Plaintiff's employment. (Def. SMF ¶ 39). However, in addition to his crew member duties, Mr. Funez also provided and performed cleaning services at the Dawsonville restaurant, and those duties gave him additional access to Plaintiff over and above the shifts on which he was scheduled to, and did, work with her. (Pl. SMF ¶¶ 1-3).

During Plaintiff's employment, Mr. Funez made statements to her that were graphically sexual in nature and he propositioned her for sexual activity. (Pl. SMF ¶¶ 4, 6).[5] At no time did Plaintiff indicate to Mr. Funez explicitly or implicitly

---

[5] Mr. Funez also made statements to Plaintiff that were not of a graphic sexual nature, including "You have very beautiful eyes," "You have very pretty eyes," "[You] have a pretty smile," "You have a gorgeous smile," "You have very sexy lips," and "Hey, sexy." (<u>See</u> Cramer Dep. at 83, 85, 87, 90, 15). Were those comments the sum of Mr. Funez's conduct, the analysis of Plaintiff's

through her words or actions that she welcomed his sexual comments, suggestions, overtures and propositions or that she considered them appropriate and/or inoffensive. (Pl. SMF ¶ 59). The particular sexual comments Mr. Funez made to Plaintiff were as follows: the second week Plaintiff worked at Bojangles', Mr. Funez asked her to give him a blow job (Pl. Dep. at 85, 87, 90, 92-93); the next week, he told her, "We are going to fuck tonight" and "I want to bend you over and fuck you up the ass" (Pl. Dep. at 94-95, 98-99); the week after that he said, "Hey, sexy" and he told her "he wanted to lay [her] down and bend [her] over" and "Hey, sexy . . . I want to put my head between your legs and make you feel good" (Pl. Dep. at 102-03, 106); and the next week he said, "Hey, sexy" and "I'm going to bend you over and make you scream" (Pl. Dep. at 110, 112). After every one of these encounters with Mr. Funez, Plaintiff reported to Sajid Akhtar, the Unit Director at the Dawsonville restaurant during Plaintiff's employment (Def. SMF ¶ 40), that Mr. Funez had said "nasty" things to her, though she never specified exactly what Mr. Funez had said, and she asked Mr. Akhtar to make Mr. Funez stop (Pl. Dep. at 93, 99-101, 104, 108, 113). Each time she told Mr.

---

sexual harassment claim would be different.  See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 584 (11th Cir. 2000) ("A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions, by telling her that she is looking "very beautiful," or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment." (citing Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 81 (1998) (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory "conditions of employment"))), overruled on other grounds, Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008).  However, the undersigned has considered those comments along with Mr. Funez's other alleged comments and conduct, discussed *infra*, in analyzing Plaintiff's hostile work environment claim.  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) (explaining that in evaluating a claim of a discriminatorily hostile work environment, the Eleventh Circuit has adopted a "totality of the circumstances approach").

Akhtar about Mr. Funez's "nasty" comments, Mr. Akhtar responded that Mr. Funez was a "nice guy," that she should just ignore him and push him away, and that if she did, Mr. Funez would leave her alone. (Pl. SMF ¶ 28).[6] No one else overheard Mr. Funez's comments to Plaintiff, and she did not tell anyone else at Bojangles' about them until she told a co-worker, Ethan Collins, about them following an incident that occurred on Friday, March 19, 2010. (Pl. Dep. at 93, 96, 99, 101, 103, 105, 107, 112-13, 115).[7]

On the afternoon of March 19th, Plaintiff had just clocked in to begin her shift, and she and Mr. Collins were talking when Mr. Funez appeared. Plaintiff described what happened next as follows:

> . . . And [Mr. Funez] stopped and talked with us and we were just cutting up and then Ethan made some offhand comment and just to call [Mr. Funez] gay just in jest.
>
> And then [Mr. Funez] goes, "I am not gay." And then I said in jest, "I don't know, you and Sajid [Akhtar] seem pretty close."
>
> And then he said some Spanish phrase to me and he goes, "I'm not

---

[6] Mr. Akhtar denies that Plaintiff ever told him that Mr. Funez had "said inappropriate sexual things to her," "engaged in sexually inappropriate, offensive or harassing behavior . . . towards her," "done or said things to her that she found objectionable or that she did[ not] want him to do" or "inappropriately touched or groped her in the restaurant while trying to kiss her." (Akhtar Dep. at 96-97).

[7] Based on the Charge of Discrimination and its attached "List of Particulars" that Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") (see Def. Ex. 18 to Pl. Dep.), Plaintiff also asserts that Mr. Funez told Plaintiff "he wanted to take her home with him, show her off to her parents, and then do sexual things to her; and he wanted to do 'a bunch of really gross things' to her." (Pl. SMF ¶ 15). Defendant objects that this evidence is based on the inadmissible hearsay testimony of Ethan Collins and therefore cannot be considered. (Def. Resp. to Pl. SMF ¶ 15). The "List of Particulars" attached to Plaintiff's EEOC charge reflects that these assertions were Mr. Collins' account of what Plaintiff allegedly told him was said to her by Mr. Funez. Defendant's objection is well taken.

gay. I'll show you."[8] And he went to the back because customers had come in and we were taking their order and getting that ready for them.

About 30 minutes later, after [Mr. Funez] had come back up to the front and he was going to clean and he said that same Spanish phrase to me again and Titus [Matthews][9] was going to leave. And I had asked [Mr. Funez] before what that phrase had meant, and he goes - - he just looked at me and then he turned back and started to mop.

And then I asked Titus what that phrase meant. I said it to him and I said, "Do you know what that means?" And he said, "No."

And on his way out the door, [Titus] stopped [Mr. Funez] and asked him the phrase and I guess [Mr. Funez] told him because he started laughing and he kept walking out.

Well, then I looked up over at [Mr. Funez]. I said, "What does that mean?" And then he made a hand gesture towards me with his hand and his mouth which looked like simulating oral sex. So I kind of got the picture and I just walked away to the back.

And then me and Ethan were cleaning and he walked past us and he goes, "I'm not gay. I will show you." And he said that to Ethan[,] too, but Ethan didn't say anything to me about it.

Then whenever I was up at the front and I was cleaning later that night, he had come up to me and bowed his chest up. And I pushed him away and then he come back to me again and he - - this time he put his hands on my hips and he leaned forward to kiss me and he took his right hand and he grabbed my crotch.

This time I pushed him away as hard as I could, and Janet McClure came over and she made him go to the back. And I don't believe she saw what had happened, but I think she saw me push him away. And she made him go back to the back of the store.

(Pl. Dep at 116-117). Plaintiff explained that she told Ms. McClure, the Manager

---

[8] Plaintiff testified that she does not speak Spanish. (Pl. Dep. at 83).

[9] Titus Matthews was a Bojangles' employee who was working at the time of the March 19th incident. (Dec. 7, 2010 Aquino Dep. at 14).

(see Collins Dep. at 48; Akhtar Dep. at 121), "how [Mr. Funez] tried to come on to me and how he tried to kiss me and she - - that was when she made him go to the back." (Pl. Dep. at 132).

Plaintiff finished out her shift and then reported to Mr. Akhtar "what happened" with Mr. Funez and how he had tried to "come on to [her]." (Pl. Dep. at 118). Mr. Akhtar responded that Mr. Funez was a "nice guy" and he told her, "Just push him away and he'll leave you alone." (Id.). Plaintiff decided that night that she would never work for Bojangles' again because she did not feel safe there. (Pl. Dep. at 132). Area Director Aquino, one of the persons designated in Bojangles' Harassment/Discrimination Policy as someone to whom an employee should make a report of harassment, was present at the Dawsonville restaurant during the time of the incident involving Plaintiff and Mr. Funez, but Plaintiff did not speak with him about it. (See Def. SMF ¶¶ 49, 50; Pl. Dep. at 183).

Plaintiff returned to the Dawsonville restaurant to turn in her uniform and name tag on March 22, 2010. (Pl. Dep. at 132-33, 155). She spoke with then-Assistant Unit Director Tina Martz ("Ms. Martz") and "told her about the incident of how [Mr. Funez] c[a]me on to [her] and he pinned [her] against the wall, tried to kiss [her], and [she] told [Mr. Akhtar] about it and he did nothing about it." (Pl. Dep. at 133; Dowdy Dep. at 15).[10] Ms. Martz provided Plaintiff with the toll-free number for the ServiceCheck hotline, and Plaintiff called the hotline while she

---

[10] Bojangles' employees use the term "manager" and "unit director" interchangeably, though it appears the correct terminology is "unit director." (See Dec. 7, 2010 Aquino Dep. at 12-13; Mar. 15, 2011 Aquino Dep. at 8-9; Akhtar Dep. at 11; Martz Dep. at 71).

was at the Dawsonville restaurant. (Def. SMF ¶¶ 44-45).[11] Plaintiff told the ServiceCheck representative what had happened on the night of March 19th. (Pl. Dep. at 134-35, 155).[12]

Pursuant to Bojangles' standard practice and its arrangement with ServiceCheck, an electronic report is immediately generated by ServiceCheck after it receives a call. (Def. SMF ¶ 54). Such an electronic record and notification was generated of Plaintiff's March 22, 2010 call and it was sent the same day by E-mail to Mr. Aquino as the Area Director, Mr. Jeff Wells as the Regional Vice President and Ms. Eubanks as the Director of Human Resources. (Def. SMF ¶ 55; Eubanks Aff. ¶ 11; see also Pl. Ex. 11 to Akhtar Dep.). Mr. Aquino began Bojangles' investigation of Plaintiff's complaint on March 22, 2010 at 6:00 p.m., less than three hours after Plaintiff made her complaint to the ServiceCheck hotline. (Def. SMF ¶ 56). Mr. Aquino telephoned Plaintiff on March 22, 2010 and spoke with Plaintiff's mother, Amanda Cramer, who indicated that Plaintiff was not available and would return Mr. Aquino's telephone call. (Def. SMF ¶ 57). Plaintiff did not return Mr. Aquino's phone call. (Def. SMF ¶ 58). On either March 22 or 23, 2010, Mr. Aquino spoke by telephone with Mr. Funez regarding the alleged events of March 19, 2010. (Dec. 7, 2010 Aquino Dep. at 49; Def. SMF

---

[11] The parties do not dispute that Plaintiff did not call the hotline prior to March 22, 2010.

[12] The parties dispute the substance of Plaintiff's report to the ServiceCheck representative. (See Def. SMF ¶¶ 46-48 and Plaintiff's responses thereto; Pl. SMF ¶¶ 48-49 and Defendant's responses thereto). The undersigned finds that the details of Plaintiff's report are not material to resolution of Defendant's motion as it is undisputed that on March 22, 2010, Plaintiff utilized the ServiceCheck hotline to report that she had been subjected to sexual harassment by a co-worker at Bojangles' Dawsonville restaurant.

¶ 59). On March 23, 2010, Mr. Aquino called the Bojangles' employees who had been working on Friday, March 19, 2010 to schedule interviews with each of them. (Def. SMF ¶ 61). On March 24, 2010, Mr. Aquino traveled to the Dawsonville restaurant to conduct in-person interviews with the Bojangles' employees. (Def. SMF ¶ 62). Mr. Aquino requested and obtained written statements from Ethan Collins, Janet McClure and Titus Matthews, the only three employees who claimed to have witnessed an incident involving Mr. Funez and Plaintiff on March 19, 2010. (Def. SMF ¶ 63). Mr. Aquino received no reports or complaints from anyone about misconduct or harassment by Mr. Funez prior to his receipt of Plaintiff's ServiceCheck complaint on March 22, 2010. (Def. SMF ¶ 64).

During Mr. Aquino's interview of Mr. Funez, Mr. Funez denied Plaintiff's allegations that he sexually harassed her. (Affidavit of Antonio Aquino, Doc. 81-5 ("Aquino Aff."), ¶ 23). Mr. Funez admitted that he had translated and repeated to Plaintiff a sexually explicit Spanish phrase (id.), and after consulting with Human Resources, Mr. Aquino terminated Mr. Funez on April 4, 2010 because of that admission. (Def. SMF ¶¶ 65, 68; Aquino Aff. ¶¶ 24-25).

On July 19, 2010, Plaintiff signed a charge of discrimination, which was received by the Equal Employment Opportunity Commission ("EEOC") on or about August 3, 2010. (Def. SMF ¶ 72; see also Def. Ex. 18 to Pl. Dep.). Plaintiff filed this civil action on August 23, 2010. [Doc. 1].

### III.  **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  The moving party has an initial burden of informing the Court of the basis for the motion and showing that there is no genuine issue of material fact.  Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986); see also SEC v. Morgan Keegan & Co., No. 1:09-cv-1965-WSD, 2011 U.S. Dist. LEXIS 71481, at *13 (N.D. Ga. June 28, 2011) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999))).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  See Celotex, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has  failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at

trial.' " <u>AFL-CIO v. City of Miami</u>, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting <u>Celotex</u>, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991), <u>cert. denied</u>, 506 U.S. 952 (1992); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B), (4). The evidence "cannot consist of conclusory allegations or legal conclusions." <u>Avirgan</u>, 932 F.2d at 1577. Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. <u>See Midwestern Waffles, Inc. v. Waffle House, Inc.</u>, 734 F.2d 705, 714 (11th Cir. 1984).

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50 (internal citations omitted). It is not the Court's function at the summary judgment stage to determine credibility or decide the truth of the matter. <u>Id.</u> at 249, 255. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." <u>Id.</u> at 255.

## IV.  <u>Discussion</u>

### A.  <u>Title VII Sexually Hostile Work Environment Claim</u>

Title VII provides that it is an unlawful employment practice for an employer

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Although "sexual harassment" is not explicitly mentioned in Title VII, "it has long been settled that the statutory phrase 'terms, conditions, or privileges of employment' includes within its scope a discriminatorily hostile or abusive environment."  Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) ("Title VII does not mention sexual harassment. Nevertheless, the Supreme Court and this Court long have recognized that 'the phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment.' " (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))), cert. denied, 529 U.S. 1068 (2000).  As the Supreme Court noted in Harris, an abusive working environment is created "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris, 510 U.S. at 21 (internal citations and quotations omitted).

To establish a hostile work environment sexual harassment claim under Title VII, the plaintiff must show:

(1) that he or she belongs to a protected group; (2) that the employee

16

has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza, 195 F.3d at 1245; accord Reeves v. CH. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc). Defendant moves for summary judgment on Plaintiff's hostile work environment claim on two grounds: (1) that Plaintiff cannot show the alleged harassment by Mr. Funez was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (2) that Plaintiff cannot show a basis for holding Defendant liable for Mr. Funez's conduct. (Doc. 81-2, Def. Br. at 8-16).

## 1.  **Severe or Pervasive Requirement**

The requirement that, in order to maintain a hostile work environment claim, a plaintiff must show that the harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment contains both an objective and a subjective component. See Reeves, 594 F.3d at 808-09; Mendoza, 195 F.3d at 1246. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond title VII's purview." Harris, 510 U.S. at 21. In evaluating whether harassing conduct objectively

altered a plaintiff's terms and conditions of employment, the Court should consider, among other things, "its frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Reeves, 594 F.3d at 808-09 (internal quotations omitted). No one factor is determinative. Rather, the Eleventh Circuit has adopted a totality of the circumstances approach. See id. at 809.

### a. **Subjectively Hostile Work Environment**

Plaintiff testified that she was "disgusted" and "really mad" about Mr. Funez's comments and that one week when she encountered him she was "still upset from what had . . . happened the previous week" (Pl. Dep. at 95, 99); she repeatedly complained to her Unit Director at the Dawsonville restaurant, Mr. Akhtar, about Mr. Funez making "nasty" comments to her, and asked Mr. Akhtar to make Funez "stop . . . and if he wouldn't if [Mr. Akhtar] would put [her] to work somewhere where [she] didn't have to work with [Funez]" (Pl. Dep. at 104); and she testified that after the incident on March 19, 2010, she told her mother she did not feel safe working at Bojangles', and she did not return to work at the Dawsonville restaurant again (Pl. Dep. at 119). A reasonable jury could find that Plaintiff subjectively perceived Mr. Funez's behavior to be "sufficiently severe and pervasive [as] to alter the terms or conditions of [her] employment." Mendoza, 195 F.3d at 1246.

### b.    **Objectively Hostile Work Environment**

Plaintiff has pointed to approximately six instances of graphic sexual statements, a gesture by which Mr. Funez simulated oral sex, and one instance in which he "grabbed [her] crotch" and tried to kiss her, over the course of approximately six weeks, during which she worked four-hour shifts two or three days a week for a total of 85.2 hours. There is evidence that Plaintiff and Mr. Funez were scheduled to work at the same time only three times during that period, but there is also evidence that the times they worked at the Dawsonville restaurant in fact overlapped more often than that. It is not clear from Plaintiff's testimony whether Mr. Funez made offensive comments to her every time she and Mr. Funez worked together or whether there were times when they worked together and he did not.

The evidence also shows that during the last incident, on March 19, 2010, Mr. Funez went up to Plaintiff and "bowed his chest up," whereupon she "pushed him away and then he c[a]me back to [her] again and . . . put his hands on [her] hips and . . . leaned forward to kiss [her] and . . . took his right hand and . . . grabbed [her] crotch," at which point Plaintiff "pushed [Mr. Funez] away as hard as [she] could." (Pl. Dep. at 118). That incident was apparently witnessed by Ethan Collins. (See Pl. Dep. 118, 122-25). Plaintiff testified that she worked the remainder of her shift following the incident, but she also testified that when she called her mother after she left work, she told her mother that she was never going back to work at the Dawsonville restaurant and that she did not feel safe. (Pl. Dep.

at 118-19).

It is questionable whether, under Eleventh Circuit case law, Mr. Funez's sexual comments to Plaintiff prior to March 19th would amount to conduct sufficiently severe or pervasive so as to create an objectively hostile or abusive work environment. See, e.g., Lockett v. Choice Hotels Int'l, Inc., 315 F. App'x 862, 863-867 (11th Cir. 2009) (unpublished decision) (finding no hostile work environment where plaintiff's co-worker "would talk about sexual positions"; described in graphic terms sexual acts he would perform on her; told her "that she needed 'to get with a real guy' "; stuck his tongue out at her two or three times; and "touched her bottom quickly"); cf. Smith v. Pefanis, 652 F. Supp. 2d 1308, 1327-28 (N.D. Ga.) (finding that plaintiff presented evidence of severe or pervasive sexual harassment where he alleged daily conduct, including sexual propositions, discussions of male genitalia and repeated rubbing, touching, smacking and grabbing plaintiff), adopted by 652 F. Supp. 2d 1308, 1313 (N.D. Ga. 2009). While the March 19th incident was clearly the most severe, threatening and/or humiliating, and it resulted in Plaintiff's decision not to return to work at the Dawsonville restaurant, it is not clear that this single, brief occurrence was the kind of "extremely serious" incident envisioned by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), that—even in combination with the previous comments and given that Plaintiff was only 17 years old at the time of these events—could be found by reasonable jurors to create an objectively hostile work environment. See Lockett, 315 F. App'x at 866 ("[T]he alleged sexual

20

remarks and two incidents of brief touching [over a four month period] fall below the minimum level of severity or humiliation needed to establish sexual harassment."). But see Johnson, 234 F.3d at 509 (finding that fifteen incidents of harassment over the course of four months, including sexual comments, rubbing plaintiff's shoulders and rubbing defendant's body parts against plaintiff is "sufficiently severe or pervasive such that it falls within the definition of sexual harassment").[13] Nevertheless, the undersigned will assume, without deciding, that there is a jury question on whether Plaintiff was subjected to sexual harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. However, as discussed below, the undersigned recommends that summary judgment be granted to Defendant because Plaintiff has not shown that there is a jury question on whether there is a basis for holding Defendant liable for Mr. Funez's conduct.

## 2. Basis for Holding Defendant Liable

The standard for imposing employer liability in cases of co-worker

---

[13] Defendant's citation (see Doc. 81-2, Def. Br. at 10) to Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238 (11th Cir. 2004) and Johnson v. Booker T. Washington Broad. Service, Inc., 234 F.3d 501 (11th Cir. 2000) to support its contention that the conduct at issue in this case was not frequent is puzzling: contrary to Defendant's argument, the court in both those cases found the conduct at issue sufficiently frequent to be actionable. See Hulsey, 367 F.3d at 1248; Johnson, 234 F.3d at 509. Plaintiff clearly testified to at least eight instances of harassing conduct, including Mr. Funez's comments prior to March 19, 2010 and his actions on that day. That number of incidents over the course of only 85.2 hours of work would, in the view of the undersigned, create a jury issue on the frequency component of the objectively "severe or pervasive" analysis. Of course frequency would not be sufficient by itself, however. See Mendoza, 195 F.3d at 1248 ("[T]o the extent [a plaintiff can] show[] frequent conduct, the frequency of it does not compensate for the absence of the other factors.").

harassment has been articulated by the Eleventh Circuit as follows: "When . . .the alleged harassment is committed by [a] co-worker[] . . . , a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)). "Actual notice is established by proof that management knew of the harassment." Watson, 324 F.3d at 1259 (citing Miller, 277 F.3d at 1278). In order to establish constructive notice, a plaintiff must show that "the harassment was so severe and pervasive that management reasonably should have known of it." Watson, 324 F.3d at 1259 (citing Miller, 277 F.3d at 1278).

### a.    **Notice of Alleged Sexual Harassment**

Plaintiff does not argue that Defendant had constructive notice of Mr. Funez's alleged harassment but contends, instead, that by virtue of Plaintiff's reports to her Unit Director, Mr. Akhtar, Defendant had actual knowledge of Mr. Funez's sexual harassment of her. (Doc. 82, Pl. Br. at 9-11). Plaintiff's argument fails for the reasons discussed below.

In Breda, the Eleventh Circuit explained that an employer is deemed to have actual notice of alleged harassment when the employer has a policy designating how reports of such allegations are to be made and that employee follows that procedure:

> In *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361 (11th Cir. 1999), we held that if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment. *See id.* at 1364. **With such a policy, the employer "itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures."** . . .
>
> When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, the employer's notice of the harassment is established by the terms of the policy.

222 F.3d at 889 (emphasis added). It is undisputed in this case that Bojangles' had a published anti-harassment policy containing a procedure for reporting suspected harassment by another employee to the Area Director, the Regional Vice President or the Human Resources Department, and that policy provided a 1-800 number for the Human Resources Department. It is also undisputed that Plaintiff did not report Mr. Funez's conduct to the Area Director, the Regional Vice President or the Human Resources Department. Defendant presented evidence that it also posted a hotline number[14] for employees to use to report improper activities, including harassment, but Plaintiff testified that she never saw that posted information. However, she called the hotline and reported that Mr. Funez had sexually harassed her when she was provided the number by Ms. Martz on

---

[14] The hotline number was different from the number for the Human Resources Department provided in the Employee Handbook and one-page Harassment/Discrimination policy. (See Exs. A, C & D to Eubanks Aff.).

March 22, 2010. It is undisputed that as of March 22, 2010, Defendant was on notice of Mr. Funez's alleged sexual harassment.

Plaintiff argues, however, that Defendant had notice of the harassment prior to the March 19, 2010 incident because on several occasions beginning in February 2010 she told Sajid Akhtar, Unit Director of the Dawsonville restaurant, that Mr. Funez had said "nasty stuff" to her. Plaintiff offers several reasons to show that it was sufficient for her to report Mr. Funez's conduct to Mr. Akhtar even though he was not Area Director, the Regional Vice President or a member of the Human Resources Department. She appears to contend, first, that she was not bound by the reporting requirements of Defendant's sexual harassment policy because, while she signed a copy of the Employee Handbook containing that policy and she signed a one-page copy of the policy itself at the beginning of her employment, she did not read the policy and she did not receive a copy of it. Plaintiff's claim that she did not read the policy does not create an issue of fact on whether she was obligated to follow Defendant's published policy for reporting sexual harassment. See, e.g., McDaniel v. Merlin Corp., No. 1:01-CV-2992-JEC, 2003 U.S. Dist. LEXIS 16472, at *29-30 (N.D. Ga. June 6, 2003) (finding that although the plaintiff asserted that she could not "escape her immediate obligation [under the policy] to report alleged sexual harassment" because she had "the ability to 'read and write'" and she "never claimed that the Defendant fraudulently failed to provide her an opportunity to read the policy").

Plaintiff also contends that in fact Mr. Akhtar was an appropriate

management employee to whom complaints of sexual harassment could be made. She maintains that Defendant admitted as much in its response to her Requests for Admission number 10 (Pl. Ex. 1 to Collins Dep.), that Mr. Akhtar testified to that effect (see Akhtar Dep. at 94), and that the language of the policy itself supports her argument. (Doc. 82, Pl. Br. at 10-11, 13 & n.17).

Taking these contentions in reverse order, the undersigned finds, first, that the portion of Defendant's policy cited by Plaintiff, i.e., "If you have any questions about what constitutes harassing behavior, ask your supervisor," does not support her contention. The policy clearly goes on to state: "If you feel that another employee is harassing you, you should immediately notify the Area Director. If you do not feel the matter can be discussed with the Area Director, you should contact the Regional Vice President. You may also contact the Human Resources Department Harassment line at 1-800-849-3360, Ext. 8401. . . ." Asking what constitutes sexually harassing behavior is not the same as reporting it, and it is the reporting of alleged sexual harassment that triggers an employer's legal duty to respond appropriately.

As for Mr. Akhtar's deposition testimony, the question to which he responded, "Yes" was, "[U]nder the company's sexual harassment policy as you understood it, were you as a unit director someone who it would be appropriate for a female employee to come to and report sexually harassing conduct?" (Akhtar Dep. at 94). It is not necessary to determine whether Mr. Akhtar's deposition testimony alone creates a jury question on whether Mr. Akhtar was an appropriate

25

person to receive an employee's complaint of alleged sexual harassment on behalf of Defendant, because Mr. Akhtar's testimony in combination with other evidence leads to the conclusion that a jury must decide that issue.

Plaintiff's Request for Admissions number 10 asked Defendant to admit or deny the following: "During Plaintiff's employment with Defendant, Manager Akhtar was designated under Defendant's policies and procedures as someone to whom Plaintiff could report incidents of sexually harassing conduct by co-workers." (See Pl. Ex. 1 to Collins Dep.). Defendant's response, in pertinent part, was as follows: "Bojangles' admits that pursuant to the company's anti-harassment policy, Plaintiff had various reporting options of **any complaint** of alleged sexual harassment, which included Akhtar as the Unit Director." (See id. (emphasis added)). Defendant contends that its admission is "consistent" with Bojangles' published policies, which instruct its employees to report **non-employee harassment** to their supervisors, "who are often Unit Directors." (Doc. 85, Def. Reply at 5). And as noted, both Defendant's Employee Handbook and Defendant's one-page Harassment/Discrimination policy provide that "[a]ny employee who experiences harassment by a non-employee . . . should report the behavior to his or her supervisor." (See Exs. A & C to Eubanks Aff.). The undersigned finds, however, that, in light of (1) Defendant's admission in response to Plaintiff's Request for Admission number 10 that under its policy Plaintiff had the option of reporting "**any complaint** of sexual harassment" to Mr. Akhtar, (2) the deposition testimony of Mr. Akhtar discussed *supra*, and (3) Defendant's

26

hotline procedure for employees to report sexual harassment (an option not set out in Defendant's Harassment/Discrimination Policy, and providing a telephone number different from the Human Resources phone number contained in that policy), a reasonable jury could find that the procedures set out in Bojangles' Harassment/Discrimination Policy were not the exclusive means by which an employee could put Defendant on actual notice of alleged sexual harassment and that Mr. Akhtar was an appropriate management employee to receive such reports. The question then becomes whether a reasonable jury could find that, when Plaintiff complained to Mr. Akhtar, she sufficiently described Mr. Funez's conduct to put Defendant on notice that she was complaining about alleged sexual harassment.

It is undisputed that, at least until after the March 19th incident, Plaintiff never gave any details or specifics about the comments Mr. Funez made to her.[15]

---

[15] Plaintiff's testimony about what she told Mr. Akhtar about the March 19th incident is vague but suggests that she gave him somewhat more specific information about what had happened: "I . . . told [Mr. Akhtar] what happened, about how [Mr. Funez] had tried to come on to me." (Pl. Dep. at 118). The court need not decide whether reasonable jurors could find that Plaintiff's March 19th report to Mr. Akhtar put Defendant on notice at that time that Mr. Funez had sexually harassed her, for several reasons. It is undisputed that Plaintiff left work after she completed her shift and told Mr. Akhtar about the incident on the night of March 19th; that she decided that night to quit her job at the Dawsonville restaurant, and she never returned to work there and was subjected to no further harassment by Mr. Funez; and that she put Defendant on notice of the alleged harassment on March 22 when she called the hotline, and Defendant began investigating her allegations within hours of receiving a copy of Plaintiff's hotline report and fired Mr. Funez within a few weeks. Thus even if it is assumed that Defendant was put on notice of Mr. Funez's alleged sexual harassment of Plaintiff on the night of March 19th shortly after the incident when Mr. Funez "grabbed [her] crotch" and tried to kiss her, Plaintiff suffered no more harassment by Mr. Funez after that night and Defendant began its investigation only three days later. There is no evidence that Plaintiff was harmed or that Defendant's investigation was in any way impeded or made less effective by that 3-day delay. The undersigned therefore assumes that the critical issue is whether Defendant was on notice of Mr. Funez's alleged harassment before the March 19th incident.

Prior to March 19th, Plaintiff told Mr. Akhtar only that Mr. Funez had made "nasty" comments to her. It is not evident from Plaintiff's use of the term "nasty" that she was complaining about comments of a sexual nature. In fact, "nasty" can refer to something that is "filthy" or "repugnant," "indecent" or "obscene," "mean," or "lacking in courtesy," among other things. See Merriam-Webster's Collegiate Dictionary 825 (11th ed. 2008); see also Geer v. Marco Warehousing, Inc., 179 F. Supp. 2d 1332, 1340 (M.D. Ala. 2001) (using "nasty" to describe the habit of "spitting"); Smith v. Mt. Sinai Med. Ctr., 36 F. Supp. 2d 1341, 1344 (S.D. Fla. 1998) (using "nasty" to describe a disagreement between an employee and her supervisor over being tardy). The undersigned finds that a reasonable jury could not find Plaintiff's complaint that Mr. Funez made "nasty" comments to her sufficient to put Defendant on notice that Plaintiff was complaining about alleged sexual harassment. See, e.g., Madray v. Publix Supermarket, Inc., 208 F.3d 1290, 1293, 1300 (11th Cir.) (finding complaint that "it made [the employee] sick for [the supervisor] to hug [her] and touch [her] and kiss [her]" not sufficient notice of alleged sexual harassment where employee did not "disclose[] the extent or precise nature of" supervisor's behavior toward employee), cert. denied, 531 U.S. 926 (2000); Leeth v. Tyson Foods, Inc., No. 10-14849, 2011 U.S. App. LEXIS 25225, at *4, 9-10 (11th Cir. Dec. 20, 2011) (unpublished decision) (finding that plaintiff's "vague complaints," made in response to a supervisor's inquiry, that a fellow employee was "hitting a nerve" did not place employer on notice of alleged sexual harassment); Nurse "BE" v. Columbia Palms West Hospital, 490 F.3d 1302, 1309-

11 (11th Cir. 2007) (holding that employee's complaints of "harassing" phone calls by fellow employee "did not put [defendant] on notice as a matter of law" that the calls constituted sexual harassment (citing Madray, 208 F.3d at 1300-01));[16] Miller, 277 F.3d at 1278 (holding that plaintiff's "generalized comment" to manager "to tell [co-employee] he needs to watch what he says to me" does "not constitute actual notice for which [the court] would impose direct liability" for alleged co-worker harassment based on ethnicity (citing Coates, 164 F.3d at 1365)); see also Schiraldi v. AMPCO Sys. Parking, 9 F. Supp. 2d 213, 220-21 (W.D.N.Y. 1998) (finding that an employee's complaints that a co-worker "wouldn't leave [her] alone" and had "called [her] names," and another employee's request to "[p]lease keep [co-worker] away from me, he's bothering me" to be insufficient to put employer on notice of sexual harassment). Like the complaints in these cases, Plaintiff's complaints to Mr. Akhtar prior to March 19th that Mr. Funez had made "nasty" comments to her were insufficient to "disclose the extent or precise nature" of Mr. Funez's comments. Accordingly, the undersigned finds that a reasonable jury could not find that Defendant had actual notice of Plaintiff's complaint of sexual harassment before the March 19, 2010 incident.

### b. **Immediate and Appropriate Corrective Action**

The undersigned now turns to the issue whether Defendant took immediate and appropriate corrective action after Plaintiff's March 22, 2010 complaint to

---

[16] In Nurse "BE", the plaintiff reported that the caller "had phoned her late at night on as many as five occasions asking her to meet him for a drink or to have dinner," but there was "no indication that [the plaintiff] suggested that any sexually explicit remarks or even sexual innuendos were made during these phone calls." 490 F.3d at 1309.

Bojangles' ServiceCheck hotline following the March 19th incident, or more precisely, whether a reasonable jury could find that Defendant did not. In Williams v. Russell Corp., 218 F. Supp. 2d 1283, 1294 (M.D. Ala. 2002), the court explained:

> There is no set or bright-line test for determining when an employer has discharged its Title VII obligations to investigate sexual harassment complaints. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000) ("We recognize that the wide variety of employment settings make it difficult to establish a uniform test for determining whether an employer's anti-harassment policy complaint procedures demonstrate the employer's reasonable care in preventing sexual harassment."), *cert. denied*, 531 U.S. 926[](2000). Whether an employer's response is sufficient depends on, among other things, the effectiveness of the steps taken, that is, whether it was reasonably likely to prevent the misconduct from recurring. What is appropriate remedial action will necessarily depend on the particular facts of the case--the severity and persistence of the harassment, and the effectiveness of any initial steps.

The evidence is uncontroverted that Area Director Aquino telephoned Plaintiff's house the evening of March 22, 2010 within three hours of Plaintiff's call to the ServiceCheck hotline in an effort to speak with Plaintiff about her complaint. (See Def. SMF ¶¶ 56, 57; Pl. Resp. to Def. SMF ¶¶ 56, 57). Plaintiff did not return his phone call. (Def. SMF ¶ 58; Pl. Resp. to Def. SMF ¶ 58). Either the same evening or the next morning, Mr. Aquino spoke by telephone with Mr. Funez about the alleged incident of March 19, 2010.[17] (Dec. 7, 2010 Aquino Dep. at 49;

---

[17] Mr. Aquino asserted in his Affidavit that "Bojangles' suspended Mr. Funez's employment pending the outcome of its investigation on March 22, 2010 and did not allow him to be placed on the work schedule after that date." (Aquino Aff. ¶ 18). Plaintiff disputes that assertion and asserts that "Funez was seen doing inventory work in the restaurant under Akhtar's supervision and direction by Assistant Unit Director Tina Martz after March 19, 2010." (See Pl. Resp. to Def. SMF ¶ 60). Ms. Martz testified that during Mr. Funez's suspension, she saw him performing inventory work in the back of the store with Mr. Akhtar on one occasion, after store hours. (Martz Dep. at

30

Def. SMF ¶ 59). The evidence is also undisputed that on March 24, 2010, Mr. Aquino interviewed Ethan Collins, Janet McClure, Titus Matthews and Gerald Hulsey, the four Bojangles' employees who were present at the Dawsonville restaurant on March 19, 2010, the date of the physical incident between Plaintiff and Mr. Funez, and requested and obtained written statements from three of them.[18] (Def. SMF ¶ 63; Aquino Aff. ¶ 21). Finally, it is undisputed that Mr. Funez was terminated from Bojangles' on April 4, 2010. (Def. SMF ¶ 65).

Given these facts, a reasonable jury could not find that once Defendant was put on notice of Mr. Funez's alleged sexual harassment of Plaintiff, Defendant "failed to take immediate and appropriate corrective action." Watson, 324 F.3d at 1259. While Plaintiff may have wished that Defendant had conducted a different or more thorough investigation (see Doc. 82, Pl. Br. at 14-16), she has not presented evidence of any "significant shortcoming" in Defendant's response to her complaint. Goodstein v. Gunther Motor Co., No. 95-6678-CIV-UNGARO-BENAGES, 1996 U.S. Dist. LEXIS 21968, at *34 (S.D. Fla. Sept. 12, 1996), aff'd, 135 F.3d 144 (11th Cir. 1998) (finding that in order to show the employer's response to a complaint of harassment was inadequate, "it is not enough for the plaintiff merely to point out ways in which she thinks the remedial

---

39-40; 87-88). As Plaintiff had already decided that she would not return to work at the Dawsonville restaurant as of March 19th, and she never did return to work there, the undersigned finds this fact immaterial to whether Defendant took appropriate corrective action after receiving Plaintiff's complaint of sexual harassment.

[18] Mr. Aquino stated that he did not obtain a written statement from Mr. Hulsey because Mr. Hulsey stated that "he did not observe any inappropriate conduct by Mr. Funez and did not observe the interaction between Mr. Funez and Ms. Cramer." (Aquino Aff. ¶ 21).

actions could have been better or to point out how the remedial actions did not meet her expectations" but "[r]ather, the plaintiff must produce evidence of a 'significant shortcoming' in the employer's response in order to hold the employer liable under Title VII" (quoting Saxton v. Am. Tel & Tel. Co., 10 F.3d 526, 535 (7th Cir. 1993))); see also Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1555 (11th Cir. 1997) (noting that the court had "never stated . . . that a complainant in a discrimination action has a right to the remedy of her choice").

It is undisputed that Plaintiff did not return Mr. Aquino's phone call to be interviewed for his investigation (Def. SMF ¶ 57). Plaintiff maintains that her mother mistakenly told her that Mr. Akhtar, not Mr. Aquino, called and Plaintiff explained that she did not want to speak with Mr. Akhtar because he had "repeatedly . . . blown her off" (Pl. Resp. to Def. SMF ¶¶ 57-58) and that she intended to wait for someone in human resources to contact her to investigate the incident (Pl. Resp. to Def. SMF ¶ 58). But Plaintiff has made no showing that she made any attempt to follow up on Defendant's effort to interview her as a part of its investigation or that the failure to interview her resulted in a less immediate or appropriate corrective action on the part of Defendant. A reasonable jury could not find that there was a "significant shortcoming" in Defendant's response to Plaintiff's complaint. See, e.g., Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1288 (11th Cir. 2003) (finding that "where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow").

For the foregoing reasons, the undersigned finds that Plaintiff has not pointed to evidence creating an issue of fact on the employer liability element of her claim. Therefore, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's sexually hostile work environment claim (Count I).

B.    **Constructive Discharge Claim**[19]

Plaintiff's constructive discharge claim against Defendant is as follows:

> Based on the sexually harassing conduct of Fernando, which culminated in a sexual assault/battery on March 19, 2010, and Defendant's failure and/or refusal to take any steps to curtail the conduct and provide Plaintiff with a safe and harassment-free work environment, Plaintiff's working conditions were rendered so intolerable as to compel her to discontinue her employment.
>
> A reasonable person who was subjected to the same conduct to which Plaintiff was subjected would find the working conditions unacceptable and intolerable.
>
> Defendant is liable to Plaintiff in damages for creating and facilitating a hostile work environment by and through its repeated failure and/or refusal to take appropriate actions to curtail and prevent same, which culminated in Plaintiff's constructive discharge.

(Doc. 1, Pl. Compl. ¶¶ 178-80).

In <u>Penn State Police v. Suders</u>, 542 U.S. 129, 146-47 (2004), the Supreme

_____

[19] Plaintiff's complaint [Doc. 1] does not indicate whether her claim for constructive discharge (Count VIII) arises under state or federal law (Doc. 1 ¶¶ 177-80). Defendant assumes in its amended brief in support of its motion for summary judgment [Doc. 81-1] that Plaintiff's constructive discharge claim arises under Title VII (<u>id.</u> at 23). In her response brief [Doc. 82], Plaintiff labels her constructive discharge claim a "state law claim[]" (<u>id.</u> at 20), but in her discussion of that claim, Plaintiff quotes the Title VII standard and cites federal cases discussing constructive discharge under Title VII, e.g., <u>Walton</u>, 347 F.3d at 1282; <u>Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1317 (11th Cir. 1989); <u>EEOC v. SDI Athens East, LLC</u>, 690 F. Supp. 2d 1370, 1383 (M.D. Ga. 2010) (Doc. 82 at 33). The undersigned will therefore analyze Plaintiff's constructive discharge claim under federal law.

Court explained the relationship between a sexually hostile work environment claim and a constructive discharge claim based on a sexually hostile work environment:

> For an atmosphere of sexual harassment or hostility to be actionable . . . the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor* [*Savings Bank, FSB v. Vinson*], 477 U.S. [57], at 67 [(1986)] (internal quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (CA8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (CA7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

For the reasons discussed *supra*, it is questionable whether a reasonable jury could find that Mr. Funez's conduct was sufficiently severe or pervasive as to create an objectively hostile work environment. But even if it is assumed that Plaintiff can create a jury question on that issue, the undersigned finds that a reasonable jury could not find that Plaintiff was subjected to "working conditions so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at 147.

By Plaintiff's own account, prior to Friday, March 19, 2010, the undesirable working conditions to which she was subjected consisted of the graphic sexual comments and propositions made to her by her co-worker Mr. Funez, which she

described as "nasty" comments to Mr. Akhtar.  While those comments were indeed crude, boorish and offensive, they hardly created "working conditions so intolerable that a reasonable person would have felt compelled to resign."  <u>Cf.</u> <u>Bryant v. Jones</u>, 575 F.3d 1281 (11th Cir. 2009) (upholding denial of summary judgment to defendant on constructive discharge/racially hostile work environment claim where CEO was abusive to plaintiff "on numerous occasions, including interaction where he appeared ready to assault her physically," a subordinate refused to hire white candidates, and another subordinate made "condescending and racially charged comments that [plaintiff] could not relate to black men or that she was too ignorant or idealistic to understand racial politics").

The March 19th incident was far more serious and involved conduct that no reasonable person should be expected to tolerate in the workplace, however. After it happened, according to Plaintiff, she completed her shift, she told Mr. Akhtar about it, she went home and she decided that night to quit her job. Plaintiff returned to the Dawsonville restaurant three days later to turn in her uniform and name tag and at that time, after speaking with Ms. Martz, called the hotline to complain about Mr. Funez's conduct, with the result that Defendant immediately began an investigation and terminated Mr. Funez within a few weeks.

 The undersigned finds that a reasonable jury could not find that Plaintiff reasonably felt compelled to resign before giving Defendant an opportunity to remedy her working conditions after making Defendant aware of the March 19th incident.  <u>See Mitchell v. Pope</u>, 189 F. App'x 911, 914 (11th Cir. 2006)

(unpublished decision) ("[A]lthough Plaintiff believed that Sheriff Pope would not be receptive to complaints about [her supervisor's allegedly sexually harassing] behavior, Plaintiff did not provide Sheriff Pope an opportunity to remedy the situation: she never formally complained in writing about [her supervisor] and never complained orally to Sheriff Pope." (citing Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996))); Kilgore, 93 F.3d at 754 ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation. None of the plaintiffs returned to work after complaining to the company's corporate management. Summary judgment on the constructive discharge claim was appropriate; the plaintiffs did not allow sufficient time for [defendant] to correct the situation."); Kimsey v. Akstein, 408 F. Supp. 2d 1281, 1303 (N.D. Ga. 2005) (stating that "Title VII does not create a cause of action for constructive discharge where - - as happened here - - the employee assumes the worst and resigns before giving management a chance to rectify the situation" when only a few days had passed between plaintiff filing an internal complaint of harassment and her resignation); Jones v. USA Petroleum Corp., 20 F. Supp. 2d 1379, 1383-84 (S.D. Ga. 1998) (stating that "[c]onstructive discharge is difficult to show if the supposedly 'intolerable' conditions lasted for only a short time" and "constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation" and holding that "neither plaintiff was constructively discharged because they failed to give [defendant] notice of [the harasser's] behavior [and] thus deprived [defendant] of

36

a chance to remedy the situation" ); see also EEOC v. Bimbo Bakeries USA, Inc., No. 1:09-CV-1872, 2010 U.S. Dist. LEXIS 13654, at *17 (M.D. Penn. Feb. 17, 2010) ("To establish a valid constructive discharge claim, a plaintiff must prove that the employer knowingly permitted a discriminatory condition to persist that was so intolerable that a reasonable person would have felt compelled to resign.").

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's constructive discharge claim (Count VIII).

## C.    Intentional Tort Claims

Plaintiff's complaint includes five Georgia intentional tort claims:  assault (Count II), battery (Count III), false imprisonment (Count IV), invasion of privacy (Count V) and intentional infliction of emotional distress (Count IX).  (Doc. 1, Pl. Compl.).  All of these claims are based on the alleged intentional misconduct of Mr. Funez that Plaintiff also alleges in support of her Title VII sexual harassment claim.

Defendant argues that it cannot be held liable for the intentional torts of its employees unless those torts are committed in furtherance of its business and within the scope of its business, and there is no such evidence in this case.  (Doc. 81-2, Def. Br. at 17).  Defendant contends that "Georgia courts have routinely held that intentional tort claims against employers for alleged sexual misconduct by their employees cannot survive summary judgment."  (Id. at 17-18 (citing Piedmont Hosp. v. Palladino, 580 S.E.2d 215, 216 (Ga. 2003); B.C.B. Co. Inc. v. Troutman, 409 S.E.2d 218, 219 (Ga. Ct. App. 1991);  Favors v. Alco Mfg. Co., 367

S.E.2d 328, 331 (Ga. Ct. App. 1988))).

Plaintiff responds that Defendant is liable for Mr. Funez's intentional torts because Defendant had knowledge of Mr. Funez's harassment of Plaintiff and failed to take action, thereby implicitly ratifying Mr. Funez's conduct. (Doc. 82, Pl. Br. at 20-22). In support of her contention, Plaintiff cites <u>Morgan v. Fellini's Pizza, Inc.</u>, 64 F. Supp. 2d 1304 (N.D. Ga. 1999); <u>Mears v. Gulfstream Aerospace Corp.</u>, 484 S.E.2d 659, 665 (Ga. Ct. App. 1997); and <u>Trimble v. Circuit City Stores</u>, 469 S.E.2d 776, 779 (Ga. Ct. App. 1996). She also maintains that she can make out the elements of her intentional tort claims, and those claims therefore should be decided by a jury. (Doc. 82, Pl. Br. at 22-32).

Defendant replies that Plaintiff's argument "wrongly presupposes that Bojangles' was aware of the alleged harassment and that knowledge of an employee's infrequent 'nasty' comments amounts to condoning an assault." (Doc. 85, Reply at 9). Defendant argues that Plaintiff's argument "rests on mischaracterizations of outdated precedent" and that in <u>Travis Pruitt & Assocs. P.C. v. Hooper</u>, 625 S.E.2d 445, 449 (Ga. Ct. App. 2005), a plurality of the court "rejected the cases cited by Plaintiff and held that 'an employer cannot, by ratification, assume liability for the tortious acts of an employee done for purely personal reasons entirely disconnected from the employer's business.'" (Doc. 85, Reply at 9-10). Finally, Defendant argues that after <u>Travis Pruitt</u>, any "ratification" of the tortious conduct of an employee "requires more than inaction by the employer," e.g., retaliation against the complaining employee, and there is

38

no such evidence in this case.  (Id. at 10-11).

"Under the principle of respondeat superior, an employer is liable for negligent or intentional torts committed by an employee in furtherance of and within the scope of the employer's business." Travis Pruitt  625 S.E.2d at 448 (citing Piedmont Hosp., 580 S.E.2d at 217).  If an employee commits a tort "for *purely personal reasons* disconnected from the [employer's] authorized business," and "not in furtherance of [it]," "[t]he employer cannot be held liable on the basis of respondeat superior."  Id. (emphasis in original) (citing Piedmont Hosp., 580 S.E.2d at 216-17).  Furthermore, while "[a]n employer may ratify tortious conduct by an employee, and thereby assume liability for unauthorized conduct," in order "for liability to be imposed on the employer by ratification, there must be evidence that the employee's conduct was done in furtherance of the employer's business and within the scope of the employment."  Id. at 449 (citing cases and O.C.G.A. §§ 10-6-1, 10-6-52, 10-6-61, 51-1-12).

The undersigned finds that Plaintiff's intentional tort claims fail for two reasons.  First, as discussed *supra*, a reasonable jury could not find that Defendant ratified Mr. Funez's alleged sexual harassment because Defendant was not put on notice of that conduct until after the March 19, 2010 incident and Defendant immediately took steps to address and correct it.  These claims also fail because after Travis Pruitt, it is clear under Georgia law that an employer cannot be held liable on a ratification theory for "sexual harassment committed by an employee not in furtherance of the employer's business, but rather for purely

personal reasons entirely disconnected from the employer's business." Travis Pruitt, 625 S.E.2d at 449. Plaintiff has pointed to no evidence that Mr. Funez's conduct was committed in furtherance of Defendant's restaurant business rather than for his own personal reasons.

Therefore, even if it is assumed that Plaintiff could prove every element of each tort alleged in connection with Mr. Funez's conduct, a question the undersigned does not reach, because a reasonable jury could not find that Defendant was on notice of that conduct until after the March 19, 2010 incident or that Mr. Funez's alleged sexual harassment of Plaintiff was done in furtherance of, and within the scope of, Bojangles' restaurant business, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's assault, battery, false imprisonment, invasion of privacy and intentional infliction of emotional distress claims (Counts II, III, IV, V and IX).

## D. <u>Negligence Claims</u>

Plaintiff's complaint also asserts two state law negligence claims: negligent supervision (Count VI) and negligent retention (Count VII). (Doc. 1, Compl.). These claims are premised on Defendant's alleged failure to properly supervise Mr. Funez so as to prevent him from sexually harassing Plaintiff (see id. ¶¶ 130-151) and upon Defendant's failure to terminate Mr. Funez once Defendant became aware of his alleged sexual harassment of Plaintiff (see id. ¶¶ 153-76).

Defendant argues that these claims fail because it did not know of the alleged conduct, and because Plaintiff did not suffer injury. (Doc. 81-2, Def. Br.

at 19-22). As to its lack of knowledge, Defendant contends that Plaintiff did not complain to a recipient designated under its policies for receiving complaints of alleged sexual harassment and that in any event, Plaintiff's complaint of "nasty" comments was insufficient to put Defendant on notice of Mr. Funez's alleged propensity to commit sexual harassment or any intentional torts. (Id. at 19-20). Defendant also contends that it "did not have constructive knowledge of any such propensity by Mr. Funez because it is uncontroverted that no one other than Plaintiff observed or complained of any misconduct by Mr. Funez." (Id. at 21). With respect to Plaintiff's lack of injury, Defendant argues that Plaintiff suffered no pecuniary loss as she immediately got a higher paying job after resigning from Bojangles', and she suffered no physical injury. (Id. at 21-22).

Plaintiff responds that Defendant was made aware of Mr. Funez's allegedly sexually harassing conduct "starting in early February, 2010" and that she "did experience significant physical issues and impact as a result of Defendant's negligence" in the form of "adverse physiological and psychological effects" such as panic attacks and hyperventilation, among other things. (Doc. 82, Pl. Br. at 22-24).

O.C.G.A. § 34-7-20 provides, in part: "The employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." Thus, "an employer may be liable for hiring or retaining an employee the employer knows or in the course of ordinary care should have known was not suited for the particular employment." Munroe v. Universal Health

Servs., Inc., 596 S.E.2d 604, 605 (Ga. 2004). Negligent retention and negligent supervision claims require a plaintiff to prove that the employer knew or should have known that the offending employee had the tendency or propensity to engage in the kind of conduct alleged to have harmed the plaintiff. See id. at 606 ("[A] defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff"); see also Leo v. Waffle House, Inc., 681 S.E.2d 258, 262 (Ga. Ct. App. 2009) (stating, "[A]n employer may be held liable [for negligent supervision] only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff" (internal quotation marks and citation omitted)); Ashmore v. J.P. Thayer Co., Inc., 303 F. Supp. 2d 1359, 1374-75 (M.D. Ga. 2004) ("A cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." (quoting Cox v. Brazo, 303 S.E.2d 71, 73 (Ga. Ct. App.), aff'd, 307 S.E.2d 474 (Ga. 1983))); Chambers v. Wal-Mart Stores, Inc., No. 1:95-CV-1979-CC, 1998 U.S. Dist. LEXIS 22698, at *25-26 (N.D. Ga. July 16, 1998) ("An employer commits the tort of negligent retention when a plaintiff is

injured by an employee, and the employer has retained that employee despite the employer's knowledge of the employee's violent or criminal propensities."), adopted by 70 F. Supp. 2d 1311 (N.D. Ga. 1998), aff'd, 193 F.3d 523 (11th Cir. 1999). Applying these principles to the facts of this case, the undersigned finds that Defendant is entitled to summary judgment on Plaintiff's negligent supervision and retention claims.

For the reasons discussed *supra*, a reasonable jury could not find that prior to the March 19, 2010 incident, Defendant was on notice that Mr. Funez had the tendency or propensity to engage in the kind of conduct alleged to have harmed Plaintiff, i.e., sexual harassment. Plaintiff's reports to Mr. Akhtar of Mr. Funez's allegedly "nasty" comments were far too vague and general to provide such notice, even if Mr. Akhtar was an appropriate person to receive it on behalf of Defendant. Furthermore, Plaintiff herself acknowledged that prior to the March 19th incident, no one else overheard Mr. Funez's comments to her, and there is no evidence that any one had made a prior complaint to Defendant that Mr. Funez had engaged in sexually harassing behavior. (Pl. Dep. at 99, 103, 107, 112; Aquino Aff. ¶ 22).

The undersigned finds that Defendant is entitled to summary judgment on Plaintiff's negligence claims for the additional reason that she has not presented evidence of a compensable injury with respect to these claims. Plaintiff has not presented evidence that she suffered pecuniary injury as a result of Defendant's alleged negligence, and in fact she acknowledges that she obtained a higher paying job immediately after she left her employment with Bojangles'. (Def. SMF

¶¶ 34, 69-70).  As for damages for emotional distress, under Georgia law, "[a] claim for emotional distress damages caused by negligence must be supported by evidence that the plaintiff suffered an impact resulting in physical injury or pecuniary loss resulting from an injury to the person." Travis Pruitt, 625 S.E.2d at 450.  Put differently, "In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury." Lee v. State Farm Mut. Auto. Ins. Co., 533 S.E.2d 82, 84 (Ga. 2000) (citing Ryckeley v. Callaway, 412 S.E.2d 826, 826 (Ga. 1992)).  Here, Plaintiff has alleged no "impact" or physical injury from any of Mr. Funez's conduct.  Her allegation that as a result of Mr. Funez's conduct, she has suffered "excessive and uncontrollable crying, panic attacks, significant depression, hyperventilation, shortness of breath, g[]asping for air, pain and tightness in the chest" and "recurring thoughts" of the incident (Pl. SMF ¶ 72) is not enough.  Lee, 533 S.E.2d at 84.

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's negligent supervision claim (Count VI) and on her negligent retention claim (Count VII).  See Hill v. Emory Univ., 346 F. App'x 390, 396 (11th Cir. 2009) (unpublished decision) (finding that district court properly granted summary judgment on plaintiff's "derivative state negligent retention claim because summary judgment was appropriate for the other substantive claims," including the plaintiff's disparate treatment and hostile work environment claims (citation omitted)), cert. denied, 130 S. Ct. 1737 (2010).

## E.    Punitive Damages Claim

In Count X of her complaint, Plaintiff seeks punitive damages pursuant to O.C.G.A. § 51-12-5.1.   (Doc. 1, Compl. ¶¶ 187-90).   That section provides in pertinent part that "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."   O.C.G.A. § 51-12-5.1(b).   As Defendant correctly points out, punitive damages may not be awarded when a plaintiff cannot recover on her underlying tort claims.   (Doc. 81-2, Def. Br. at 22 (citing Benefit Support, Inc. v. Hall Cnty., 637 S.E.2d 763, 771 (Ga. Ct. App. 2006) ("Since [Benefit] cannot recover on [its] underlying tort claims as a matter of law, there can be no punitive damages thereon." (internal quotation marks and citation omitted))).   Furthermore, Plaintiff has not pointed to evidence from which a reasonable jury could find the requisite misconduct on the part of Defendant that would support an award of punitive damages.   Therefore, it is also **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's punitive damages claim (Count X).

## F.    Attorney's Fees and Expenses of Litigation Claim

Finally, Plaintiff seeks an award of her expenses of litigation, including attorney's fees, pursuant to O.C.G.A. § 13-6-11 in Count XI.   (Doc. 1, Compl. ¶¶ 192-93).   That Georgia code section provides as follows: "The expenses

of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." As a prerequisite to an award under that section, a plaintiff must be awarded damages or other relief on the underlying claim. Ga. Dep't of Transp. v. Douglas Asphalt Co., 677 S.E.2d 699, 703 (Ga. Ct. App. 2009). In light of the undersigned's recommended disposition of Plaintiff's state law claims, and because no reasonable jury could find that Defendant has "acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense," the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's claim for attorney's fees and expenses of litigation (Count XI).

## V. <u>Summary</u>

It is **RECOMMENDED** that Defendant's motion for summary judgment, as amended [Docs. 59, 81] be **GRANTED** and that Plaintiff's claims be **DISMISSED**.

The Clerk is **DIRECTED** to terminate the referral of this action to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this 8th day of February, 2012.

*Susan S. Cole*
_____
SUSAN S. COLE
United States Magistrate Judge